UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

In re:                              )     Case No. 02-17966
                                    )
JOHN A. GROVE,                      )     Chapter 7
        Debtor.                     )
                                    )     Adversary Proceeding No. 02-1426
JOHN A. GROVE,                      )
        Plaintiff,                  )     Judge Arthur I. Harris
                                    )
v.                                  )
                                    )
EDUCATIONAL CREDIT                  )
MANAGEMENT CORP.,                   )
        Defendant.                  )

## MEMORANDUM OF OPINION

The plaintiff, John A. Grove, filed this adversary proceeding seeking a discharge of his student loan debt, now in excess of $173,000, as an undue hardship pursuant to 11 U.S.C. § 523(a)(8). In lieu of trial testimony, the parties agreed to have this matter heard on joint stipulations as well as the depositions of the parties' two medical experts. For the reasons that follow, the Court finds that Grove's student loan debt remains a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(8), with the exception of any student loan debt still owing at the end of the 300-month repayment period, should Grove consolidate his student loan debt under the U.S. Department of Education's income contingent repayment plan, which is discharged.

## PROCEDURAL BACKGROUND AND JURISDICTION

On July 23, 2002, Grove filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. On August 27, 2002, the Chapter 7 trustee filed a report of no assets, and on November 1, 2002, Grove received his Chapter 7 discharge. On November 15, 2002, Grove filed this adversary proceeding, seeking a discharge of his student loan debt as an undue hardship pursuant to 11 U.S.C. § 523(a)(8). On June 2, 2002, Educational Credit Management Corporation filed its answer as successor in interest to Great Lakes Educational Loan Services, Inc.

The trial in this case was initially scheduled for April 26, 2004, but was rescheduled several times at the request of the parties. By agreement of the parties (Docket #47), the depositions of the two medical experts, James Sechler, M.D., for the plaintiff and Sushil Sethi, M.D., for the defendant, were submitted to the Court in lieu of testimony at trial. The trial was last scheduled to go forward on December 15, 2004, with Grove as a witness. Grove, however, did not appear on December 15, 2004. In a letter dated December 13, 2004, Grove's cardiologist, Dr. Sechler, expressed his concern that the stress of testifying might cause irreparable further damage to his patient's already precarious cardiac condition. Both parties consented to submitting joint stipulations in lieu of testimony from Grove at trial (Docket #57). Following closing arguments from counsel on

2

January 26, 2005, the Court took the matter under advisement.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and Local General Order No. 84, entered on July 16, 1984, by the United States District Court for the Northern District of Ohio. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This memorandum constitutes the Court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

The plaintiff, John A. Grove, was born on January 3, 1948, and is currently fifty-seven years old. Joint Stip. ¶ 5. At age forty-four Grove took out his first student loans for his own education. *Id.* The loans were used in large part to finance Grove's education at Baldwin Wallace College where he obtained a Master of Business Administration degree, qualifying him to work as a college instructor. *Id.* Grove is divorced and has not remarried. *Id.* ¶ 4. He neither receives nor pays support payments. Def. Ex. I at 6.

Grove resides in Parma Heights, a suburb of Cleveland, in a six-room house with a total living area of 1,518 square feet. Joint Stip. ¶ 4. The house is valued at $155,000. Def. Ex. I at 6. Grove owes approximately $134,000 on the first mortgage and approximately $10,000 on a second mortgage. Schedule D. He

3

pays third parties to do all routine repairs or house maintenance. Joint Stip. ¶ 4. Grove's nineteen-year-old son also resides in the house and takes care of the grass and shrubs. *Id.* The son is not financially compensated for this work, nor does he compensate his father for his room and board at the residence. *Id.* Grove listed this son as his sole dependent on his 2002 and 2003 federal income tax returns. Joint Ex. 1.

On July 23, 2002, Grove filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. In addition to the first and second mortgages and student loan debt, Grove's schedules include $17,000 for a Social Security overpayment, $21,270 for credit card debts, $10,000 for a deficiency on an automobile lease after the vehicle was repossessed, and $1,875 for unpaid medical bills.

*Debtor's Income*

Grove is presently employed as an instructor at both Myers University and Bryant & Stratton College. Joint Stip. ¶ 3. According to Grove's federal income tax returns, in 2000, Grove earned $9,024 and received a tax refund, including earned income credit, of $4,217. Def. Ex. E. In 2001, Grove earned $8,635 and received a tax refund, including earned income credit, of $3,581. Def. Ex. F. In 2002, Grove earned $20,898 and received a tax refund, including earned income credit, of $2,112. Def. Ex. G. In 2003, Grove earned $21,653 and received a tax

4

refund, including earned income credit, of $1,858. Joint Ex. 1. In 2004, Grove had estimated gross income from employment of $30,000. Joint Stip. ¶ 3.

Grove's current monthly take-home pay is $2,402. Joint Ex. 4. Table 1, below, illustrates how Grove's monthly income compares to the federal poverty guidelines.[1]

\*\*\*\*\*\*\*\*\*

*Table 1:  Monthly Income*

| | | |
|---|---|---|
| Debtor's current monthly take-home pay | $2,402 | |
| Monthly take-home pay above poverty level one-person household | $1,626 | [$2,402-$776] |
| Monthly take-home pay above poverty level two-person household | $1,361 | [$2,402-$1,041] |

\*\*\*\*\*\*\*\*\*

---

[1] In 2004, the poverty levels for one-person and two-person households were $9,312 and $12,492 per year or $776 and $1,041 per month. Annual Update of the HHS Poverty Guidelines, 69 Fed. Reg. 7336-01 (Feb. 13, 2004). The poverty guidelines are established by the Department of Health and Human Services. The 2005 poverty guidelines were published in February, 2005, shortly after this proceeding was deemed heard and submitted. Annual Update of the HHS Poverty Guidelines, 70 Fed. Reg. 8373-02 (Feb. 18, 2005). The Court will continue to use the 2004 figures because the debtor's most recent income and expense figures were also from 2004.

5

## Debtor's Expenses

Grove's current expenses are summarized in Table 2.

**\*\*\*\*\*\*\*\*\*\***

*Table 2:  Monthly Expenses (excluding student loans)*

| Category | Debtor's budget |
|---|---|
| Home mortgage payments | $1,061 |
| Second mortgage payments | $100 |
| Real estate taxes | $200 |
| Home maintenance | $50 |
| Electricity and heating fuel | $250 |
| Water and sewer | $50 |
| Telephone | $55 |
| Cable | $60 |
| Food | $500 |
| Clothing | $70 |
| Laundry and dry cleaning | $40 |
| Medical and dental expenses | $50 |
| Transportation | $125 |
| Auto installment payments | $270 |
| Auto insurance | $90 |
| Recreation | $0 |
| Charitable contributions | $40 |
| | |
| Total | $3,011 |

**\*\*\*\*\*\*\*\*\*\***

6

*The Student Loan Debt*

The student loans at issue were incurred between March 1992 and March 2000 in a total amount of $138,500. Joint Stip. ¶ 5. Almost all of Grove's student loans have variable interest rates, with most of them currently at either 3.37 percent or 4.17 percent. Def. Ex. B. Grove has made no payments on the loans, relying on forbearances and deferments from 1992 through 2002. Joint Stip. ¶ 5. As of December 5, 2004, Grove has twenty-one different student loans, with a total indebtedness of $172,803.34. Def. Ex. B.

Student loan debtors such as Grove have several possible loan consolidation options, including the standard repayment plan, the extended repayment plan, and the income contingent repayment plan. 34 C.F.R. § 685.208, *et. seq.* The standard repayment plan requires payments over a ten year period. The extended repayment plan, for a debt of this magnitude, extends payments over thirty years. The income contingent repayment plan requires participation for twenty-five years. *Id.* Grove's monthly student loan payments under the various consolidation options are summarized below in Table 3.

Student loan debtors such as Grove are also free to seek an administrative disability discharge. 34 C.F.R. § 674.61. Such a discharge is unrelated to bankruptcy and does not require a finding of undue hardship. It does require a

7

finding by the Department of Education that the student loan debtor is totally and

permanently disabled. 34 C.F.R. § 674.51(s). Although Grove's employment

currently makes him ineligible for an administrative disability discharge, such a

discharge may well be an option in the future should Grove's health deteriorate to

a point where he is totally and permanently disabled.

**********

*Table 3: Monthly Student Loan Payments (assuming consolidation)\**

Standard repayment plan     $1,700
120 months

Extended repayment plan
360 months        $764

Income contingent
repayment plan
one-person household
300 months        $345

Income contingent
repayment plan
two-person household
300 months        $292

\* This table assumes a consolidated loan of $173,000, with a 3.37 percent annual
interest rate fixed for the life of the loan. Grove's actual interest rate, and
therefore his payments, may be higher, depending upon the weighted average of
interest rates for the loans being consolidated. *See* Docket #58 at 4 & Ex. A and
online calculator maintained by the U.S. Department of Education *at*
www.ed.gov/offices/OSFAP/DirectLoan/RepayCalc/dlentry2.html/ (last visited
April 4, 2005).

**********

8

Under the income contingent repayment plan, Grove would make monthly payments, with the amount adjusted annually for his family size and his previous year's gross income, as reported on his federal income tax return. 34 C.F.R. § 685.209. Though Grove would be obligated under the income contingent repayment plan to make monthly payments for twenty-five years, *he would not be required to work for the full twenty-five years*. If his adjusted gross income fell below the poverty level because he retired from work or was unable to work, the monthly payments would simply drop to $0. The income contingent repayment plan also permits adjustments to a borrower's repayment obligations for special circumstances, such as a loss of employment. *See* 34 C.F.R. § 684.209(c)(3). Otherwise, Grove would generally be obligated each year to pay toward his student loans twenty percent of his adjusted gross income above the poverty level. 34 C.F.R. § 685.209(a)(2)(ii) & (3).

Any unpaid interest or principal remaining after twenty-five years would be written off; however, the unpaid balance would, in theory, constitute imputed income to Grove for tax purposes. 34 C.F.R. § 685.209(c)(4)(iv); 26 C.F.R. § 61(a)(12). For example, if Grove were to make payments of $292 per month as listed in Table 3, his payments would not even cover the approximately $486 in monthly interest on a principal balance of $173,000, assuming a consolidated loan

9

interest rate of 3.37 percent. Thus, without a significant change in his economic circumstances, after twenty-five years of payments under the income contingent repayment plan, Grove would be facing an enormous tax liability.

### Debtor's Medical Problems

Grove has a history of serious medical problems. These include: congestive heart failure, cardiac tachydysrhythmia (*i.e.*, an irregular heartbeat), colon surgery, ulcerative colitis, giant cell arteritis, and stroke. Def. Ex. L at 9. In 2004 Grove had an implantable cardioverter-defibrillator (ICD) pacemaker implanted to treat his irregular heartbeat. *Id.* at 4.

The Court finds that considerable common ground exists in the deposition testimony of the two medical experts: Dr. Sechler, Grove's cardiologist since 1994, and Dr. Sethi, the defendant's expert, who reviewed Grove's medical records and conducted a brief medical examination of Grove in July, 2004. For example, there is little dispute as to Grove's medical history and current ailments. Nevertheless, some differences do exist as to the experts' opinions regarding Grove's prognosis for the future.

In the words of Dr. Sechler, "[Grove] has so much wrong that he's very impaired" and this impairment will "most likely" impact on Grove's ability to work in the future. Sechler Dep. Tr. at 23. "I'm surprised he's still going and he's

10

doing as well as he is, really. He's a real trooper . . . ." *Id.* When asked whether it was his opinion within a reasonable medical certainty that Grove's activities are going to be severely limited in the future, he responded: "They may well be." *Id.* at 24. On cross-examination, Dr. Sechler declined to opine that Grove was currently totally disabled from a medical standpoint, indicating that it may depend upon the type of employment. *Id.* at 31. When asked whether Grove's medical condition would totally prevent Grove from continuing to teach, Dr. Sechler responded, "It may." *Id.* at 32.

On the other hand, Dr. Sethi opined, "Although [Grove] has a history of cardiac disease, his physician has controlled it very nicely. It is well under control." Sethi Dep. Tr. at 21. Dr. Sethi concluded that Grove would be able to perform his job activities as a professor, which Dr. Sethi describes as "light-duty work activity." *Id.*

> From just clinical examination and review of the records, within reasonable probability, I believe he could continue to perform the job activities for the next foreseeable time.
> No one can tell with 100 percent surety. I wouldn't know about myself that I'll be there tomorrow, but what clinically I could see, he was under control.

*Id.* at 22.

11

The Court finds Grove's work history helpful in resolving whatever differences of opinion may exist between the two medical experts. Despite his history of serious medical problems, Grove has been able to attend and graduate from an MBA program and now holds down two college teaching positions that pay him a combined total of about $30,000 per year. Therefore, the Court finds that, although the future remains uncertain, the most likely prognosis is that, notwithstanding Grove's history of serious medical problems, Grove will be physically able to continue his employment and his current income level for another ten years, at the end of which Grove would be sixty-seven.

## LAW

Section 523 of the Bankruptcy Code addresses exceptions to discharge and provides, in part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt--
>
>     * * *
>
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

12

## DISCUSSION

Section 523(a)(8) of the Bankruptcy Code provides that an educational loan is not dischargeable in bankruptcy "unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents." The Bankruptcy Code does not define "undue hardship." Consequently, courts have developed various tests to determine whether "undue hardship" exists. In *Oyler v. Educational Credit Management Corp. (In re Oyler)*, 397 F.3d 382 (6th Cir. 2005), the Sixth Circuit joined at least seven other circuits that have formally adopted the *Brunner* test, named after the case of *Brunner v. New York State Higher Education Service Corp.*, 831 F.2d 395 (2d Cir. 1987).

Under the *Brunner* test, a debtor must establish the following three elements in order to have a student loan discharged on the basis of "undue hardship" under § 523(a)(8):

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

831 F.2d at 396. It is the debtor's burden to establish, by a preponderance of the evidence, that each of the elements from the *Brunner* test have been met. *See, e.g.,*

13

*Flores v. U.S. Dept. of Education (In re Flores)*, 282 B.R. 847, 853 (Bankr. N.D. Ohio 2002).

*Minimal Standard of Living*

The Court will begin its analysis with the first prong of the *Brunner* test: whether Grove would be unable to maintain a minimal standard of living for himself and his dependents if forced to repay his student loans. The essence of the minimal standard of living requirement "is that a debtor, after providing for his or her basic needs, may not allocate any of his or her financial resources to the detriment of . . . student loan creditor(s)." *Mitcham v. U.S. Dep't of Educ. (In re Mitcham)*, 293 B.R. 138, 144 (Bankr. N.D. Ohio 2003) (citing *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir. 1996)).

> The *Brunner* standard meets the practical needs of the debtor by not requiring that he or she live in abject poverty . . . before a student loan may be discharged. On the other hand, the *Brunner* standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices.

*In re Faish*, 72 F.3d 298, 305-06 (3d Cir. 1995). The analysis of the first prong centers around two considerations: (1) the debtor's income and (2) those expenses which are necessary for the debtor to meet his or her basic needs. *In re Flores*, 282 B.R. at 853.

14

Grove's current gross income is about $30,000 per year, with net take-home pay of about $2,400 per month. The record reflects that this income is significantly higher than the debtor's income for the preceding years; however, nothing in the record suggests that Grove can anticipate significantly higher income in the foreseeable future. Rather, as discussed previously, given Grove's significant medical problems, current age of fifty-seven, and an anticipated deterioration in Grove's health over time, the Court finds that a realistic estimate of Grove's future work life is ten years, and his net income of $2,400 per month ($30,000 gross per year) should remain constant in real terms.

Grove's current expenses, excluding student loan obligations, total just over $3,000 per month, which is approximately $600 per month above his current take-home pay. However, the appropriate test is not the debtor's actual spending but rather "those expenses which are necessary for the debtor to meet his or her basic needs." *Id.* at 854 (finding court should not expect debtor to "live in abject poverty" but should require "major sacrifices, both personal and financial").

By way of comparison, the 2004 poverty guidelines equate to $776 per month for an individual and $1,041 per month for a family of two. *See* Table 1. Grove's monthly take-home pay of $2,400 amounts to $1,626 per month above the poverty level for an individual and $1,361 per month above the poverty level for a

15

family of two. If Grove were to devote all of his take-home pay above the poverty level to repaying his student loans, he would theoretically be able to pay $1,361 per month (assuming a family of two) or $1,626 per month (assuming a family of one). Table 3 indicates, however, that Grove would need more than $1,700 of disposable income in order to fully repay his loans over ten years. In other words, were Grove to devote all of his projected take-home pay above the poverty level to paying off his student loans for the rest of his expected work life, he would still have significant outstanding student loan debt.

Therefore, while it is certainly not an undue hardship for Grove to find less expensive housing or otherwise reduce some of his current living expenses, given the size of Grove's student loan debt and the limitations on his current earnings and expected work life, Grove has established that he would be unable to maintain a minimal standard of living for himself and his dependents if forced to repay his *entire* student loan balance.

### Additional Circumstances

The second prong of the *Brunner* test requires a showing of additional circumstances that indicate Grove's distressed state of financial affairs is likely to persist for a significant portion of the student loan repayment period. *In re Oyler*, 397 F.3d at 385. "Such circumstances must be indicative of a 'certainty of

16

hopelessness, not merely a present inability to fulfill financial commitment.' "

397 F.3d at 386 (quoting *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993)).

The Court acknowledges that Grove's gross annual income of $30,000 per year is not so far below the median household income figure of $43,318[2] that it indicates a "certainty of hopelessness" about repaying at least a portion of the student loan debt. Under many circumstances, this income level might indicate an ability to pay off a large student loan debt. Grove's situation is different, however, because his future work life is estimated to be only ten years due to his health and age-related limitations. The extended repayment plan provides more reasonable monthly payments, *see* Table 3, but one cannot realistically expect a fifty-seven year old with Grove's current health problems to continue working for an additional thirty years.

Furthermore, these health and age-related limitations are beyond the debtor's control and are not borne of free choice. Whether it was wise, either from Grove's standpoint or from a societal standpoint, for Grove to return to school at age forty-four and borrow so heavily for his education is simply not relevant to this Court's analysis. For better or worse, our government and universities have

---

[2] U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2003, available at* http://www.census.gov/prod/2004pubs/p60-226.pdf (last visited April 4, 2005).

enabled if not encouraged students of all ages to finance their education by borrowing heavily, even if there is little chance that such debt will be repaid in full. The deferment process, while laudatory, also has the effect of encouraging more education and more borrowing as a means of postponing repayment. It is perhaps ironic that Grove's present ability to pay even a portion of his student loan debt rests in large part upon Grove's students incurring student loan debts of their own. *Cf. Derose v. EFG Tech. & Educ. Credit Mgmt. Corp. (In re Derose)*, 316 B.R. 606, 608-09 (Bankr. W.D.N.Y. 2004) (discussing relevance, if any, under *Brunner* of debtor's decision to begin chiropractic school at age forty-four and incur over $160,000 in student loan debt).

Grove is facing the seemingly impossible task of repaying a student loan debt of $173,000 over an expected work life of just ten more years. Accordingly, the Court finds that Grove has met the second prong of the *Brunner* test, at least with respect to his ability to pay off his *entire* student loan debt.

### Good Faith

The third prong of the *Brunner* test requires that a debtor establish that he or she has made a good faith effort to repay his or her student loan obligation. This factor recognizes that "[w]ith the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans,

18

as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *In re Roberson,* 999 F.2d at 1136. As one would expect, of primary importance in this regard is whether the debtor actually made payments on their student loan obligations, and if so, in what amount. *Green v. Sallie Mae Servicing Corp. & Great Lakes Higher Educ. Corp. (In re Green),* 238 B.R. 727, 736 (Bankr. N.D. Ohio 1999).

In the present case, Grove has failed to make any payments on his student loan obligation. Notwithstanding, this fact, alone, does not automatically foreclose the existence of good faith under the third prong of the *Brunner* test. *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys),* 356 F.3d 1302, 1311 (10th Cir 2004) ("[T]he failure to make a payment, standing alone, does not establish a lack of good faith."); *In re Flores,* 282 B.R. at 856.

In a situation, such as this, where there is an absence of any payments on the student loans and the debtor seeks a hardship determination shortly after completing his education and reentering the work force, the Court believes that the debtor has a heightened burden. The debtor must demonstrate that less drastic measures such as seeking temporary forbearances, minimizing expenses, or maximizing income are unavailable or unworkable or that taking the time to attempt such measures would itself cause an undue hardship. *Cf. McCarthy v.*

19

*Madigan*, 503 U.S. 140, 146-49 (1992) (discussing exceptions to general requirement that a party must first exhaust administrative remedies, such as inadequate administrative remedies or impending irreparable injury). For example, a debtor might establish good faith in the absence of any payments by demonstrating that the circumstances are so dire and the future outlook so bleak that nothing short of an immediate discharge of the debt will avoid an undue hardship on the debtor or the debtor's dependents.

In applying the third prong of the *Brunner* test to the present case, the Court recognizes that Grove has not yet paid anything towards his student loans because he filed this adversary proceeding just as he was beginning repayment. Therefore, to the extent that Grove seeks an undue hardship determination without any real effort to repay the loans, this weighs against a finding of good faith. On the other hand, the Court recognizes that when Grove commenced this adversary proceeding his health and financial situation were both worse than at present. In addition, when Grove filed this adversary proceeding in 2002, the Sixth Circuit appeared to permit partial discharges of student loans under 11 U.S.C. § 105, even without a finding of undue hardship under 11 U.S.C. § 523(a)(8) and therefore without a finding of good faith effort to repay. *See Tenn. Student Assistance Corp. v. Hornsby*, 144 F.3d 433, 438-40 (6th Cir. 1998); *DeMatteis v. Case W. Reserve*

20

*Univ. (In re DeMatteis)*, 97 Fed. Appx. 6, No. 02-3003, 2004 WL 445167, (6th Cir. March 8, 2004); *see, e.g., Grine v. Tex. Guaranteed Student Loan Corp.*, 254 B.R. 191, 198-99 (Bankr. N.D. Ohio 2000). Plus, Grove had other reasons for seeking a discharge under Chapter 7 beside his student loan debt, making this a reasonable time for attempting to discharge some or all of his student loan debt. Nor does it seem unreasonable for Grove to withhold making payments on his student loans during the pendency of this adversary proceeding.

Although the Court acknowledges that the question is a close one, the Court finds that the debtor acted in good faith in seeking an almost immediate discharge, or at least partial discharge, of his student loan debts once repayment began shortly upon completion of his MBA education. As stated earlier, even if Grove were to devote all of his expected take-home pay above the poverty level toward his student loan debt for the rest of his expected work life, he still would not be able to pay his student loan debt in full. In the face of that insurmountable debt, plus significant non-student loan debt and significant long-term health problems, Grove has satisfied the third prong of the *Brunner* test, at least with respect to paying off the *entire* student loan debt.

### *Overlay of Income Contingent Repayment Plan on* Brunner *Test*

The Sixth Circuit has now directed that the bankruptcy courts within this

21

circuit use the *Brunner* test to determine whether a debtor has established an undue hardship within the meaning of 11 U.S.C. § 523(a)(8). *See In re Oyler*, 397 F.3d at 385. Unfortunately, it is unclear how the potential availability of loan consolidation under the income contingent repayment plan fits precisely within the *Brunner* three-part test. *See, e.g., Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 292 B.R. 635, 638-39 (B.A.P. 8th Cir. 2003) (finding under totality of circumstances debtor should be able to make twenty-five years of income contingent repayment plan payments); *Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 500 (B.A.P. 9th Cir. 2002) (failing "good faith" prong of *Brunner* because not applying for income contingent repayment plan); *In re Derose*, 316 B.R. at 608-09 (The income contingent repayment plan "changed the 11 U.S.C. § 523(a)(8) landscape dramatically."); *Storey v. Nat'l Enter. Sys. (In re Storey)*, 312 B.R. 867, 875 (Bankr. N.D. Ohio 2004) (same as *In re Birrane)*; *Stupka v. Great Lakes Ed. (In re Stupka)*, 302 B.R. 236, 244-45 (Bankr. N.D. Ohio 2003) (same). *Cf. Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 308 B.R. 495, 507 (B.A.P. 10th Cir. 2004) (applying Tenth Circuit's approach to *Brunner* test and finding that failure to inquire into income contingent repayment plan did not prohibit finding of good faith where evidence showed that "even if eligible, the Debtors could not have made their [income contingent

22

repayment plan] payments"); *Balaski v. Educ. Credit Mgmt. Corp. (In re Balaski)*, 280 B.R. 395, 400 (Bankr. N.D. Ohio 2002) (participating in income contingent repayment plan is just "one factor in a lengthy list of factors," and court does not accept view that debtor must be held "hostage for twenty-five years to debt and compounding interest"). In this portion of the opinion, the Court will apply the *Brunner* test to Grove while assuming that Grove is eligible to consolidate his loans under the income contingent repayment plan.

One possible conclusion, which this Court is unaware of any prior court holding, is that there can never be a finding of undue hardship under 11 U.S.C. § 523(a)(8) if loan consolidation under the income contingent repayment plan is available. Under this theory, the repayment formula of the income contingent repayment plan incorporates each debtor's ability to pay,[3] making the undue hardship provision of 11 U.S.C. § 523(a)(8) obsolete. Arguments against such a conclusive determination for all debtors include the failure of a family's adjusted gross income figure to take into account potentially large medical expenses and the fairness of making personal student loan debts an obligation of the entire family. *See In re Alderete*, 308 B.R. at 507 (finding that "even if eligible, the

---

[3] Under the income contingent repayment plan, a family never has to devote more than 20 percent of its adjusted gross income above the poverty level for payment of student loans. 34 C.F.R. § 685.209(a)(2)(ii) & (3).

Debtors could not have made their [income contingent repayment plan] payments"); *In re Balaski*, 280 B.R. at 400 (participating in income contingent repayment plan is just "one factor in a lengthy list of factors"); *see also In re Howe*, 319 B.R. 886 (B.A.P. 9th Cir. 2005) (determining that bankruptcy court should have conducted an individualized analysis of debtor's expenses under § 523(a)(8) instead of simply adopting IRS collection standards to establish amount debtor needed for minimal standard of living). In any event, this Court is not prepared to apply a *per se* rule but will instead examine the specific effect that this repayment option has on Grove and any dependents.

Were Grove to consolidate his student loans under the income contingent repayment plan, he would pay $292 per month. *See* Table 3. The Court finds that Grove has failed to establish, under the first part of the *Brunner* test, that Grove cannot maintain a minimal standard of living for himself and his dependents if forced to make payments under the income contingent repayment plan. While Grove's schedules indicate that he does not have enough disposable income in his current budget to pay $292 per month, the Court believes that Grove can reduce his expenses substantially and still maintain a minimal standard of living.

Grove's current budget indicates monthly take-home income of $2,402 and monthly expenses of $3,011. In order to pay $292 per month on his current

24

income, Grove would need to reduce his other monthly expenses to around

$2,100, a reduction of about $900. The Court believes that Grove can achieve

most of this reduction by lowering his housing and utility costs. There is nothing

to suggest that Grove cannot find less expensive housing in the Greater Cleveland

area. For example, if Grove and his adult son were to move to an apartment and

pay up to $1,000 per month in rent and utilities, including cable, Grove could

reduce his current monthly expenses by about $825. *See* Table 2. In *Hornsby* the

Sixth Circuit reversed a bankruptcy court's finding of undue hardship, *see*

*Hornsby*, 144 F.3d at 438, in the face of living arrangements that appear to be

significantly more frugal than those of Grove and his adult son. *See Hornsby v.*

*Tenn. Student Assistance Corp. (In re Hornsby)*, 201 B.R. 195, 199 (Bankr. W.D.

Tenn. 1995) (noting that debtor, her spouse, and their three children were living in

a two-bedroom apartment and paying $670 per month in rent). In addition, the

Court believes that Grove can find another $75 in combined reductions from other

categories of his monthly budget, including: food ($500), clothing ($70), and

laundry and dry cleaning ($40). *See* Table 2.

    While the Court acknowledges that these are significant reductions and

include giving up ownership of a home, such reductions are expected under

section 523(a)(8) and relevant case law. *See, e.g., Hornsby*, 144 F.3d at 438

25

(noting Hornsby family income, while modest, was significantly above poverty

guideline for family of five, and that Hornsbys "do not seem to have minimized

expenses in every way possible"); *In re Faish*, 72 F.3d at 305-06. Such reductions

will leave Grove with a budget that enables him to spend, on top of his student

loan payment, more than $1,000 per month above the poverty level for a

two-person household. Moreover, even without the student loan obligation,

Grove's budget is out of balance by about $600 per month, *see* Joint Ex. 4,

suggesting that Grove's budget does not accurately reflect his current situation, or

that the current situation will need to change in any event. Furthermore, while the

Court has suggested some specific reductions in expenses, Grove is free to choose

other options. For example, Grove's adult son may be able to contribute income

to the family budget.

Some courts have held that an adult child of the debtor cannot be a

dependent for purposes of 11 U.S.C. § 523(a)(8);[4] however, the Court need not

---

[4] *See, e.g., Williams v. Educ. Credit Mgmt. Corp. (In re Williams)*, 301 B.R.
62, 73 (Bankr. N.D. Cal. 2003) (finding that adult son's health care is not an
expense that can be included in minimal standard of living consideration); *Educ.
Credit Mgmt. Corp. v. Buchanan*, 276 B.R. 744, 752 (N.D. W.Va. 2002) ("If given
the choice between giving money to their creditors or their legally independent
children, undoubtably most debtors would choose their children. Were this
allowed, few debtors would be adjudged capable of repaying their debts."); *Logan
v. N.C. State Educ. Assistance Auth. (In re Logan)*, 263 B.R. 796, 800 (Bankr.
W.D. Ky. 2000) ("It is unreasonable to expect creditors holding legitimate claims

26

make such a determination because the income contingent repayment plan uses the definition of dependent found in the Internal Revenue Code, and the Internal Revenue Code, like many federal statutes, indicates that unmarried student children, with some exceptions, can be classified as dependents until the age of twenty-four. 26 U.S.C. § 152(c)(3).[5] The record does not indicate whether Grove's nineteen-year-old son is currently a student, but the defendant does not dispute that, should Grove consolidate under this option, his monthly payment would be based on a family size of two.

As the Court noted earlier, where there is an absence of any payments on the student loans and the debtor seeks a hardship determination shortly after completing his education and reentering the work force, the Court believes that the debtor has a heightened burden. The debtor must demonstrate that less drastic

---

to remain unpaid to any extent while the Debtor is supporting any adult children in her home.").

[5] By way of comparison, the U.S. Department of Education generally expects parents to contribute to the cost of college education for their adult children between the ages of 18 and 24. *See* 20 U.S.C. § 1087vv(d) (defining an "independent student" for purposes of student loan eligibility); 34 C.F.R. § 668.2(b) (defining a "dependent student" and "independent student" for purposes of determining the "expected family contribution" to a financial aid applicant's higher education). For example, to be deemed "independent" a student must generally be married, over twenty-four, orphaned, have dependents of his or her own, or be enrolled in a masters or doctorate program. *Id.*

27

measures such as seeking temporary forbearances, minimizing expenses, or maximizing income are unavailable or unworkable or that taking the time to attempt such measures would itself cause an undue hardship.

In the present case, Grove has not shown that it would be an undue hardship for him to make payments under the income contingent repayment plan. While the income contingent repayment plan may not be a perfect alternative, its availability does significantly reduce the potential hardship that results from "excepting such debt from discharge under" 11 U.S.C. § 523(a)(8). *Cf. In re Oyler*, 397 F.3d at 386 n.2 (noting that Oyler can "alleviate some of the burden of repayment" by consolidating his student loans under the income contingent repayment plan). To the extent that Grove believes that he has not been given an adequate opportunity to demonstrate that making such payments would cause an undue hardship, he may move for relief under Bankruptcy Rule 9023 and Fed. R. Civ. P. 59. In addition, should Grove's circumstances change, and should his payment obligations under the income contingent repayment plan constitute an undue hardship, Grove will be free to seek a new undue hardship determination under section 523(a)(8).

In short, after considering the income contingent repayment plan, this Court finds, with one caveat discussed below, that Grove has failed to meet the first

28

prong of the *Brunner* test. Grove has failed to demonstrate that he cannot

maintain, based on current income and expenses, a "minimal" standard of living

for himself and his dependents *if forced to repay the loans under the income*

*contingent repayment plan option.*

*Partial Discharge of Student Loan Debt*
*Still Owing at the End of the 300-month Repayment Period*

Under the income contingent repayment plan, Grove would be obligated to

make monthly payments for 300 months, *i.e.*, twenty-five years. If Grove

consolidated his student loan debt under the income contingent repayment plan, *he*

*would not be required to work for the full twenty-five years.* If his adjusted gross

income fell below the poverty level because he retired from work or was unable to

work, the monthly payments would simply drop to $0. Any unpaid interest or

principal remaining after twenty-five years would be written off; however, the

unpaid balance would, in theory, constitute imputed income to Grove for tax

purposes. 34 C.F.R. § 685.209(c)(4)(iv); 26 C.F.R. § 61(a)(12).

At the end of the twenty-five year repayment period, Grove likely would be

facing a huge tax liability for imputed income because his projected payments of

$292 per month would not even cover the approximately $486 in monthly interest,

29

let alone reduce the principal of $173,000.[6] While the Court would hope that a legislative or regulatory fix for this potential tax liability is effected before such liability becomes due for Grove and similarly-situated debtors at the end of their twenty-five year repayment periods, the Court is nonetheless concerned about including the income contingent repayment plan as a viable option for this debtor in determining whether an undue hardship exists under 11 U.S.C. § 523(a)(8). Indeed, given Grove's age, fifty-seven, and the size of his student loan debt, there is a strong likelihood that, should he live another twenty-five years, he will have a substantial amount of student loan debt written off at the end of the 300-month repayment period. Under these circumstances, the Court does not believe that the income contingent repayment plan, as it currently exists, is a viable option for Grove. Such a plan would leave Grove exposed to potentially large tax consequences beyond his control, even if he diligently devotes all of the income required under the plan for 300 months.

Nevertheless, the Court believes that it can resolve the tax liability issue by effecting a partial discharge of Grove's student loan debt. Under *Miller v. Pennsylvania Higher Education Assistance Agency (In re Miller)*, 377 F.3d 616

---

[6] This assumes a consolidated loan interest rate of 3.37 percent on the principal balance of $173,000.

30

(6th Cir. 2004), the Court can only effect a partial discharge if payment of the entire student loan debt would be a hardship under 523(a)(8) and *Brunner*. As the Court noted earlier, absent the income contingent repayment plan, Grove would be entitled to at least a partial discharge under 523(a)(8) and *Brunner*. Therefore, the Court believes that it can effect a partial discharge of *any student loan debt still owing at the end of the 300-month repayment period*. In doing so, the Court is not discharging any *tax debt*, rather the Court is discharging, under 11 U.S.C. § 523(a)(8), the *student loan debt* still owing at the end of the 300-month repayment period. Any debt discharged under Title 11 is not taxable income, 26 U.S.C. § 108(a)(1)(A). Therefore, any balance owed at the end of the 300-month repayment period is discharged under Title 11 without creating a tax liability for the debtor.

Thus, Grove's student loan debt is only an undue hardship as to any sums remaining at the end of the income contingent repayment plan's 300-month repayment period, and only this portion is discharged. The Court does not believe that this partial discharge will make Grove ineligible for the income contingent repayment plan; however, should Grove, for any reason, be deemed ineligible to participate in the income contingent repayment plan, the Court believes that such a finding would be a basis for moving this Court for relief under Bankruptcy

31

Rule 9024 and Fed. R. Civ. P. 60(b). *Accord In re DeRose*, 316 B.R. at 610

(concluding that debtor may reopen case if he is turned down for income

contingent repayment plan).

## CONCLUSION

For the foregoing reasons, Grove's student loan debt owed to the defendant

is a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(8), with the exception

of any student loan debt still owing at the end of the 300-month repayment period,

should Grove consolidate his student loan debt under the U.S. Department of

Education's income contingent repayment plan, which is discharged.

IT IS SO ORDERED.

Arthur I. Harris
United States Bankruptcy Judge

32